# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| **United States of America,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Criminal Action Number** |
| ) | **06-00267-01-CR-W-DW** |
| **Garnell Johnson,** ) | |
| ) | |
| **Defendant.** ) | |

## Report and Recommendation

Pending before the Court is Defendant Garnell Johnson's MOTION TO SUPPRESS EVIDENCE WITH SUGGESTIONS, filed October 13, 2006 (Doc. #22 ). On November 15, 2006, the undersigned held an evidentiary hearing on the defendant's motion. Defendant Garnell Johnson was present and was represented by his counsel, Assistant Federal Public Defender Ronna Holloman-Hughes. The government was represented by Assistant United States Attorney Stefan C. Hughes. At the evidentiary hearing, the evidence consisted of the testimony of the sole government witness, Officer Anthony Melkowski of the Kansas City, Missouri Police Department.

On the basis of all the evidence adduced at the evidentiary hearing, the undersigned submits the following:

**PROPOSED FINDINGS OF FACT**

1. On July 28th, 2006, Officer Melkowski was assigned to work "proactive duty." (Tr. 4)

2. Officers assigned to work "proactive duty" do not answer calls for service. The officers are directed to "go after drug dealers, gun suppression, things of that nature and . . . target hot spots." (Tr. 4)

3. Some of the "hot spots" in Officer Melkowski's area are Linwood and Holmes; Armour and Troost; and 44th and Paseo streets in Kansas City, Missouri. (Tr. 4)

4. Prior to July 28, 2006 Officer Melkowski was aware of numerous police calls to the area of 44th and Paseo, had attended several community meetings at which community members complained of drug activity at 4344 Paseo, and was aware of information from confidential informants that drugs were being sold on the steps of 4344 Paseo.[1] (Tr. 4-5) In addition, other police teams who worked in the area had informed Officer Melkowski of suspected drug activity at 4344 Paseo. (Tr. 5-6)

5. Shortly after midnight on July 28, 2006, Officer Melkowski was travelling eastbound on 44th Street in a marked police car approaching Paseo when he saw two black males sitting on the stairs of 4344 Paseo and another black male standing beside them. One of the sitting black males was drinking a Colt 45 malt liquor. (Tr. 7)

6. Officer Melkowski exited his vehicle and approached the black males on the steps of 4344 Paseo. He asked if they lived there. They told him they did not.

7. In light of the facts that the individuals did not live at 4344 Paseo, as well as the information set out in Finding of Fact #4 above, Officer Melkowski conducted a "pedestrian check" on the three individuals. (Tr. 9)

8. A "pedestrian check" consists of identifying a person's name, date of birth, what they are doing at the scene, and running a records check for warrants. (Tr. 9)

9. The pedestrian check revealed that the individual drinking the Colt 45 malt liquor was Michael D. Jones, a 16-year-old minor, who lived at 7116 Indiana and had a pending Johnson County, Kansas warrant. (Tr. 9-12) A second individual was identified as Marcus T. Frazier, a 19-year-old minor, who lived at 4107 Kenwood and had two Kansas City, Missouri moving violation warrants for his arrest. (Tr. 11-12)

---

[1]The confidential informants told police that they had observed 12 to 15 different cars stop at different times during the day at 4344 Paseo and that individuals on the stairs would go down to the cars, conduct hand-to-hand drug transactions, return to the stairs, and the cars would drive away. (Tr. 10)

10. The third individual, Defendant Garnell Johnson, who lived one block away at 4226 Paseo, told Officer Melkowski that he had walked down the street to walk his "pretend nephews" home. (Tr. 11) Because Officer Melkowski knew that neither 7116 Indiana nor 4107 Kenwood where within walking distance of 4344 Paseo he found Defendant Johnson's statement "a little suspicious." (Tr. 11-12)

11. At the beginning of the pedestrian check, Officer Melkowski asked the three individuals to take their hands out of their pockets. (Tr. 13) They complied. However, during the course of the pedestrian check, Officer Melkowski had to direct Defendant Johnson to remove his hands from his pockets three times and each time Defendant Johnson returned his hands to his pockets. Based upon Defendant Johnson's repeated refusal to leave his hands clear and Officer Melkowski's concerns for his personal safety,[2] Officer Melkowski frisked Defendant Johnson and found a .25 caliber automatic weapon in Defendant Johnson's pocket. (Tr. 15)

12. Officer Melkowski thereupon placed Defendant Johnson under arrest.[3] (Tr. 17)

## PROPOSED CONCLUSIONS OF LAW

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. CONST. amend. IV. As made clear in the Fourth Amendment, the constitution does not forbid all searches and seizures, but only <u>unreasonable</u> searches and seizures. *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446 (1960). Nonetheless, as the United States Supreme Court pointedly noted over one hundred years ago:

---

[2]Officer Melkowski testified that had Defendant Johnson not repeatedly put his hand into his pocket, Officer Melkowski would not have conducted a pat down. (Tr. 15) Officer Melkowski has arrested individuals for hand-to-hand drug transactions 25 to 30 times and has had occasions when those individuals were armed and attempted to harm either him or his partner. (Tr. 17) Officer Melkowski testified that these experiences informed his decision to conduct a pat down of Defendant Johnson. (Tr. 17)

[3]Officer Melkowski testified that the entire encounter from his initial observation of the individuals until the arrest of Defendant Johnson took approximately ten minutes. (Tr. 17)

3

> No right is held more sacred, or is more carefully guarded, by the
> common law, than the right of every individual to the possession
> and control of his own person, free from all restraint or
> interference of others, unless by clear and unquestionable authority
> of law.

*Union Pacific Railroad Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001 (1891).

In many search and seizure scenarios, the question of legal authority (as well as reasonableness) is presumptively satisfied by a judicially-issued warrant. However, over the years, many exceptions to the warrant requirement have been recognized. For instance, and pertinent to the issue in this case, in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868 (1968), the Supreme Court held that a law enforcement officer can stop and briefly detain a person for investigatory purposes, even without a warrant, if the officer has a reasonable suspicion – supported by articulable facts – that criminal activity "may be afoot," even if the officer lacks probable cause for an arrest. *Id*. at 30, 88 S.Ct. at 1884-85. However, the officer conducting such an investigatory stop must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.'" *Id*. at 27, 88 S.Ct. at 1883. Moreover, the mere fact that an officer's suspicion or hunch, in fact, was well-founded is <u>not</u> dispositive for a constitutional analysis, rather, the Fourth Amendment requires "some level of objective justification for making the stop." *INS v. Delgado*, 466 U.S. 210, 217, 104 S.Ct. 1758, 1763 (1984).

The concept of "reasonable suspicion" is not "readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 2329 (1983). In large part, common sense dictates the analysis of reasonable suspicion.

> The process does not deal with hard certainties, but with
> probabilities. Long before the law of probabilities was articulated
> as such, practical people formulated certain common-sense

4

conclusions about human behaviors; jurors as fact-finders are
permitted to do the same and so are law enforcement officers.

*United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695 (1981).  As such, in evaluating the validity of a *Terry* stop, "the totality of the circumstances – the whole picture" must be considered.  *Id*. at 417, 101 S.Ct. at 695.

Nonetheless, it is well-settled that:

> [n]ot all personal encounters between law enforcement officials and citizens fall within the ambit of the Fourth Amendment.  A consensual encounter between an officer and a private citizen does not implicate the Fourth Amendment.

*United States v. Jones*, 269 F.3d 919, 925 (8th Cir. 2001).  The determination of when an encounter between law enforcement and a citizen rises to the level of non-consensual (and thus triggers the Fourth Amendment) is "a fact intensive one which turns upon the unique facts of each case."  *Id*.  Nonetheless, several matters have been considered by the courts and as summarized recently by the Eighth Circuit:

> Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen.  Mere police questioning does not constitute a seizure, and so long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual.  It is clearly not a seizure, for example, for an officer to approach an individual in a public setting, identify himself as a police officer, and ask the individual to step aside and talk to detectives.  A request to see identification is not a seizure, as long as the police do not convey a message that compliance with their request[ ] is required..  There is no *per se* requirement that an officer inform a citizen of his right to refuse consent, and there is no presumption that consent is invalid where given without an explicit notification of the right to refuse.  That many people agree to speak with police when asked does not tend to suggest that reasonable persons do not feel free to decline.  While most citizens will respond to a police request, the fact that

5

> people do so, and do so without being told they are free not to
> respond, hardly eliminates the consensual nature of the response.

*United States v. Vera*, 457 F.3d 831, 834-35 (8th Cir. 2006) (*citations and internal quotations omitted*).[4] Rather, "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1872-73 (1980). In the present case, at the point when Officer Melkowski approached Defendant Johnson and the two other individuals on the steps of 4344 Paseo and began questioning them, an investigatory stop arguably occurred, thereby triggering Fourth Amendment scrutiny.[5] The Government asserts that this "pedestrian check" or investigative detention is justified under a reasonable suspicion analysis. Consequently, the validity of the pedestrian check turns on an evaluation of the facts known to Officer Melkowski prior to the stop and whether those facts provide an appropriate level of <u>objective</u> justification that criminal activity might be afoot.

The facts known to Officer Melkowski can be easily summarized:

    (1)    the area of 44th and Paseo had been the subject of numerous police calls;

---

[4] Nor is a Fourth Amendment seizure instituted merely by a law enforcement <u>requesting permission</u> to search a person's pockets, luggage, or automobile. *See, e.g., United Stater v. Ortiz-Monroy*, 332 F.3d 525, 528 (8th Cir. 2003); United States v. Jones, 269 F.3d 919, 925 (8th Cir. 2001); *Florida v. Bostick*, 501 U.S. 429, 434-35, 111 S.Ct. 2382, 2386 (1991).

[5] The record is silent as to whether Officer Melkowski requested permission to speak with the individuals or (more likely) immediately inquired as to whether they lived at the scene. However, for purposes of this discussion, in an abundance of caution to err on the side of the Fourth Amendment, the Court will assume that the encounter was not consensual beyond the point of the Officer Melkowski's initial question when he determined that none of the individuals resided at 4344 Paseo.

(2) the address at 4344 Paseo was in one of the "hot spots" Officer Melkowski was assigned to "proactive duty";

(3) at several community meetings, there were numerous citizen complaints of drug activity on the steps of 4344 Paseo;

(4) confidential informants had provided information that drugs were being sold on the steps of 4344 Paseo. The confidential informants told police that they had observed 12 to 15 different cars stop at different times during the day at 4344 Paseo and that individuals on the stairs would go down to the cars, conduct hand-to-hand drug transactions, return to the stairs, and the cars would drive away;

(5) other police teams who worked in the area had informed Officer Melkowski of suspected drug activity at 4344 Paseo; and

(6) none of the individuals standing on the steps of 4344 Paseo in the early morning hours of July 28, 2006 resided at that address.

While these facts may present a somewhat close case, when considered in totality with the officer's experience and specialized training, the Court concludes that Officer Melkowski had sufficient and reasonable suspicion to make an investigatory stop under *Terry*.

Moreover, once the investigatory stop was properly initiated, Officer Melkowski was entitled to conduct an investigation "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Cummins,* 920 F.2d 498, 502 (8th Cir.1990) (*quoting Terry v. Ohio, supra*, 392 U.S. at 20, 88 S.Ct. at 1884). To that end, the Court concludes that Office Melkowski acted properly in inquiring regarding the identity and purposes of the individuals standing on the steps of 4344 Paseo, asking the individuals to keep their hands in plain sight, and in checking for any pending warrants, and (eventually) in

conducting a pat down of defendant Johnson after he repeatedly refused to keep his hands in plain sight. As part of the investigatory stop, the Officer Melkowski was entitled to "check for weapons and take any additional steps that [were] 'reasonably necessary to protect their personal safety and to maintain the *status quo* during the course of the stop.'" *United States v. Navarrete-Baron*, 192 F.3d 786, 790 (8th Cir. 1999) (*quoting*, *in part*, *United States v. Hensley*, 469 U.S. 221, 235, 105 S.Ct. 675, 682 (1985)). The resulting discovery of the weapon on Defendant Johnson's person provided Officer Melkowski probable cause to arrest Defendant Johnnson.

> Probable cause to arrest exists if, at the moment that an arrest was made, the facts and circumstances within the arresting police officer's knowledge were sufficient to support a prudent person's belief that the person arrested was committing a crime.

*United States v. Gonzales*, 220 F.3d 922, 925 (8th Cir. 2000). Furthermore, the duration of the stop "lasted no longer than reasonably necessary to investigate Officer Melkowski's suspicion that the individuals were conducting hand-to-hand drug transactions from the steps of 4344 Paseo.

Accordingly, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order DENYING Defendant Garnell Johnson's MOTION TO SUPPRESS EVIDENCE WITH SUGGESTIONS, filed October 13, 2006, (Doc. #22).

Counsel are reminded that each has 10 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

*/s/ John T. Maughmer*
                                    **John T. Maughmer**
                           **United States Magistrate Judge**